**In re Jeffrey B. RICE, Debtor.**

**No. 01–10552–RGM.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Feb. 18, 2004.

Robert O. Tyler, Alexandria, VA, trustee.

Frank J. Bove, Office of the U.S. Trustee, Alexandria, VA, U.S. Trustee.

Jeffrey B. Rice, Fairfax, VA, pro se.

Robert K. Coulter, Office of U.S. Attorney, Alexandria, VA, L. Darren Goldberg, Draper & Goldberg, PLLC, Leesburg, VA, Becky Jane Miner, Richmond, VA, for creditor.

## MEMORANDUM OPINION

ROBERT G. MAYER, Bankruptcy Judge.

This case is before the court on the motion of Robert O. Tyler, Trustee, to sell the debtor's residence and the debtor's objection to the trustee's motion. The debtor and his wife, Elizabeth Rice, own real property as tenants by the entirety in which they reside and which the parties refer to as "the residence." The debtor and Donna Rice, his former wife, own a second property as tenants in common. Donna Rice resides in it and the parties refer to it as "the farm." The issue presented is whether the farm should be sold before the residence.

### The Residence

The trustee has a non-contingent contract for sale of the residence for $475,000. The property is owned by the debtor and his wife, Elizabeth, as tenants by the entirety. It is subject to a first deed of trust with a pay-off of about $243,378.[1] The property is subject to federal income tax liens. The IRS' proof of claim in Elizabeth Rice's case asserts liens in the amount of $56,423.76 which are for tax liabilities owed jointly by Elizabeth and Jeffrey Rice. It asserts $11,793.00 in unsecured priority claims and $36,804.59 in unsecured general claims. The proof of claim filed by the IRS in Jeffrey Rice's case asserts liens of $194,014.03[2] and unsecured priority claims of $26,003.82. While the property is held as tenants by the entirety, Jeffrey Rice's individual tax liabilities may be liens on his interest in the residence. *United States v. Craft*, 535 U.S. 274, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002). *Cf. Pitts v. United States*, 946 F.2d 1572 (4th Cir.1991) *certified question answered in Pitts v. United States*, 242 Va. 254, 408 S.E.2d 901 (1991).

### The Farm

The farm is owned by the debtor and his former spouse, Donna Rice. They each own a one-half interest as tenants in common. It is worth about $745,000. Jeffrey Rice's interest is subject to a first priority judgment lien in favor of Donna Rice for past due child and spousal support and for a lump sum award to Donna Rice. The total lien in favor of Donna Rice is about $136,000. Jeffrey Rice's interest is further subject to a federal tax lien in favor of the

---

1. This amount comes from Option One's proof of claim filed in this case. It does not include any post-petition arrearage. See Footnotes 7 and 16 for a discussion of post-petition arrearages.

2. Some of these amounts are for joint obligations with Elizabeth Rice.

Internal Revenue Service as discussed above. The amount of the federal tax lien on his interest as a tenant in common is $194,014.03. This tax lien is the same lien that encumbers the residence.[3]

### Prior Proceedings

*Partition Suit.* Donna Rice and Jeffrey Rice separated in the early 1980's and were divorced in 1986. At that time, Jeffrey Rice was ordered to pay Donna Rice spousal support in the amount of $650.00 per month, child support in the amount of $350.00 per month and a lump sum award of $44,500.00. The lump sum award was to be paid with interest at the rate of 12% per annum. Some time before March 1994, Jeffrey Rice filed a partition suit against Donna Rice in the Circuit Court of Fauquier County, Virginia, which is the jurisdiction in which the farm is situate. The partition suit required an accounting between them to determine the relative credits arising from rents Donna Rice received, repairs and improvements that she made and paid for, and other expenses, such as real estate taxes, insurance and mortgage payments made by both of them. The matter was referred to a commissioner in chancery who reported on August 30, 1996. The matter was referred back to the commissioner on October 14, 1997 to bring the accounting up-to-date. The commissioner filed his second report with the Circuit Court on January 15, 1999. The Circuit Court has not approved the second commissioner's report.

*Jeffrey Rice's Bankruptcy.* Jeffrey Rice filed this case on February 12, 2001 as a chapter 11 case. It is his second bankruptcy petition.[4] One significant difficulty in this case was his obligation to the Internal Revenue Service, the amount of which he disputed. He objected to the Service's proof of claim and on July 9, 2002, the court entered an order allowing the claim in part and denying it in part. The debtor filed a new chapter 11 plan and disclosure statement. The disclosure statement was approved on August 20, 2002. The matter did not progress and the case was converted to a chapter 7 case on December 10, 2002 after the lender secured by the residence obtained relief from the automatic stay. The chapter 7 trustee was appointed and proceeded to market the residence.

*Elizabeth Rice's Bankruptcy.* Elizabeth Rice filed a voluntary petition in bankruptcy pursuant to chapter 7 of the United States Bankruptcy Code in this court on April 15, 2003, Case No. 03–11801. She is represented in that case by her husband, Jeffrey B. Rice, an attorney and the debtor in this case. The case was originally filed as a chapter 7 petition because Elizabeth Rice did not have sufficient income to fund a chapter 13 plan. Jeffrey Rice's case was, at that time, a chapter 7 case and Robert O. Tyler was

---

3. The IRS asserts that the order of sale is important because the oldest IRS tax liens are individual liens against Jeffrey Rice only. If the farm is sold first, the oldest liens will be paid first from his proceeds of sale from the farm. The joint liens on the residence, which are inferior in priority to the individual liens, are probably unsecured as to the residence, at least in part, because of lack of equity in the residence. However, the joint liens may become secured if the prior individual liens are discharged by payment from the proceeds from the sale of the farm.

4. Mr. Rice filed a prior petition in this court on April 26, 1996, Case No. 96–12206–MVB, which is within 6 years of the filing of the petition in this case. It started out as a chapter 13 case and was first converted to a chapter 11 case, then to a chapter 7 case. He was granted a discharge on January 21, 1999. The bar date for objecting to a discharge in this case appears to be March 24, 2004.

the trustee in his case. Tyler was also appointed trustee in Elizabeth Rice's case.

The trustee sought to sell the residence and obtained a sales contract for $470,000. A notice of sale was mailed to all creditors of August 29, 2003. Jeffrey Rice objected to the sale in this case asserting that the sales price was inadequate and that the farm should be sold first. He asserted that if the farm were sold first, all of his debts would be paid and the sale of the residence would be unnecessary. Elizabeth Rice filed the same objection in her case. The trustee set the matter for a hearing on January 12, 2004. On January 8, 2004, Elizabeth Rice filed a motion to convert her case to a chapter 13 case asserting that she now had sufficient income to fund a chapter 13 plan. The IRS filed a motion to reconvert the case to a chapter 7 case. Elizabeth Rice filed a proposed chapter 13 plan. It proposes to sell the farm and to fund any remaining debt from her future income.

*Adversary Proceeding Against Donna Rice.* The trustee filed a complaint against Donna Rice on April 23, 2003 pursuant to § 363(h) of the Bankruptcy Code seeking to obtain authority to sell the debtor's interest and her interest in the farm subject to her rights under § 363(i). She filed an answer asserting, among other defenses, that the sale would work an undue hardship on her. She also asserts that she would like to exercise her right to purchase the property under § 363(i).

*The Trustee's Sales Contracts.* The trustee's first sales contract for the residence fell through. He now has a second sales contract with a sales price of $475,000. The debtor again objected to the sale, arguing that the farm should be sold first. Donna Rice is prepared to make an offer to purchase Jeffrey Rice's half-interest in the farm. Her ability to do so is affected by the extent of her lien on the farm and Jeffrey Rice's credits arising from the accounting in the partition suit.

### Discussion

■ The debtors, Jeffrey and Elizabeth Rice, assert that the farm should be sold before the residence. They argue that if the farm is sold first most of the debts will be paid in full. They argue that the remaining balance can be paid by Elizabeth Rice in her chapter 13 case.

*Gross Analysis of Sale of Both Properties.* If the proofs of claims are accepted as filed or as allowed, the debtors' argument is unavailing. The value of the residence is $475,000. The value of the farm is $745,000 with Jeffrey Rice's half-interest being worth $372,500. The gross value of the two properties is $847,500. See Table 1, *infra* at 7. The liens on the two debtors' interests in the properties total $379,378. They are the first trust on the residence and Donna Rice's lien on Jeffrey Rice's interest in the farm. A reasonable cost of sale of the properties at 8% of their total value is $67,800, based on the full value of the residence and one-half the value of the farm. The trustee's fee and other costs of administration are likely to be about $45,625. There will be income taxes on the sale of the debtor's interest in the farm which the court estimates at $22,500 (15% tax rate on a capital gain of $150,000).[5] When this is totaled, value less liens, costs of sale, unsecured claims and costs of administration (including income taxes), the

---

5. This number is a preliminary estimate only. The court did not take into account any distribution to Donna Rice to pay past due spousal support. Spousal support is ordinarily deductible for income tax purposes by the payor (here Mr. Rice) and in includable in the payee's (here Donna Rice) taxable income. It is not immediately apparent how much is spousal support, child support and property division.

estate is insolvent to the extent of $101,663.79. This means that all the creditors will not be paid in full even if both properties are sold.

This is illustrated by the following two tables. Table 1 shows the equity remaining after the sale of each property and the payment only of the first trust, Donna Rice's lien, income taxes incurred by the estate, the costs of sale and the costs of administration of the estate. Table 2 shows the remaining claims to be paid from the remaining proceeds.

**Table 1.**
**Proceeds from Sales of Real Estate**

| Item | Residence | Farm | Total |
|---|---|---|---|
| Estimated Value [6] | $475,000.00 | $372,500.00 | $847,500.00 |
| First Trust [7] | $243,378.00 | $      0.00 | $243,378.00 |
| Costs of Sale [8] | $ 38,000.00 | $ 29,800.00 | $ 67,800.00 |
| Donna Rice Lien [9] | $      0.00 | $136,000.00 | $136,000.00 |
| Costs of Administration | $ 27,000.00 | $ 18,625.00 | $ 45,625.00 |
| Income Taxes on Estate [10] | $      0.00 | $ 22,500.00 | $ 22,500.00 |
| Remaining Equity [11] | $166,622.00 | $165,575.00 | $332,197.00 |

**Table 2.**
**Claims Not Included in Table 1**

| Claimant | Amount of Claim |
|---|---|
| Va. Dept. of Taxation [12] | $ 46,237.99 |
| IRS—secured [13] | $194,014.00 |

6. The estimated value given for the farm is Jeffrey Rices's one-half interest. The estimated value for the residence is the full value.

7. From Proof of Claim 1 filed by Option One in Jeffrey Rice's case. No proof of claim was filed in Elizabeth Rice's case. The parties seem to accept that the balance is $357,000. The proof of claim asserts a pay-off of $243,378. There appears to be a post-petition arrearage about $40,000. The arrearage has not been added into these computations.

8. The costs of sale are estimated at 8%, a 6% real estate commission and 2% for all other costs and credits.

9. Donna Rice filed Proof of Claim 5 asserting claims totaling $280,528.01. No objection to the proof of claim has been filed. The amount used is the amount asserted by Donna Rice as a lien at oral argument.

10. The income tax consequences are apportioned entirely to the farm because any gain from the sale of the residence may be excluded from income for federal income tax purposes. The tax consequences arising from the sale of each property may not be proportional to its value when tax basis, payment of spousal support from the proceeds and the exclusion from income of gain on the sale of ones residence are taken into account. The apportionment of the tax consequences between the two properties is not relevant if both are sold.

11. This is the Estimated Value less the First Trust, the Costs of Sale, Donna Rice's Lien, the Costs of Administration and the income taxes arising from the sale.

12. From Proof of Claim 2 in Jeffrey Rice's case.

13. From Order allowing IRS proof of claim entered on July 12, 2002 (Docket Entry 101) and amended proof of claim. Proof of Claim 1 in Elizabeth Rice's case shows secured claims of $56,423.76, unsecured priority claims of $11,793.00 and unsecured general claims of $36,804.59. It appears that almost all of these amounts are included in the IRS proof of claim filed in Jeffrey Rice's case. The small differences represent additional interest on the IRS's proof of claim in Elizabeth Rice's case. Consequently, $137,590.24 represents individual secured tax claims against

| | |
|---|---|
| IRS—unsecured [14] | $ 49,080.79 |
| Balance of Donna Rice Claim | $144,528.01 |
| Total | $433,860.79 |

It is apparent from these tables that the Rice's total indebtedness significantly exceeds the equity in the two properties. The sequence in which the properties are sold is irrelevant. All creditors will not be paid in full in either event.

However, Elizabeth Rice, Jeffrey Rice argues, is in a chapter 13 proceeding. Could she formulate a chapter 13 plan that would pay the remaining equity in the residence and thereby eliminate the necessity for its sale? The chapter 13 plan would need to pay creditors $166,622.00 (the remaining equity in the residence), adjusted for the chapter 13 trustee's fees and costs in order to meet the liquidation test. Bankruptcy Code § 1325(a)(3) and (a)(5)(B). The chapter 13 trustee's costs and fees can be reasonably estimated at 8% of the amount distributed and would be $14,488, for a total of $181,110.[15]

Elizabeth Rice would need to pay $181,110 over, at most, 60 months. That is $3,018 a month. She simply does not have the ability to do this. Her amended Schedules I and J, filed on January 23, 2004, reflect gross monthly income of $1,000 and net disposable monthly income of $308. Her original Schedules I and J,

filed on May 1, 2003, reflect gross monthly income of $1,000 and net disposable monthly income of $70. Moreover, the total income for the family, that is for both Jeffrey Rice and Elizabeth Rice is probably insufficient. The court notes that Option One which holds the first trust on the residence and Jeffrey Rice consented to a modification of the automatic stay because there was a post-petition delinquency. The consent order, dated September 27, 2002, (Docket Entry 117) reflects delinquent post-petition mortgage payments for the period from September 2001 through March 2002 in the amount of $17,141.22. Those payments were required to be brought current by July 15, 2002, in four installments. A notice of default was filed on November 22, 2002, asserting that the regularly scheduled mortgage payments due from April 2002 through November 2002 were then delinquent and that three of the four arrearage payments were also delinquent. (Docket Entry 117). Jeffrey Rice was unable to obtain confirmation of his chapter 11 plan and it is plain that Elizabeth Rice will not be able to obtain confirmation of an effective chapter 13 plan.[16]

Jeffrey Rice and $56,423.76 represents joint secured tax claims against both Jeffrey and Elizabeth Rice.

14. Same source as secured claim. See Footnote 12.

15. The chapter 13 trustee's costs and fees vary over time but may not exceed 10% of the amount distributed to creditors. The chapter 13 trustee's fees and costs are currently about 8% of distributions.

16. It appears that there is now a substantial post-petition arrearage to Option One which makes matters worse. It means that there

will be even less money available to the chapter 7 trustee from the sale of the properties which makes it even less likely that all creditors would be paid in full in any event and thus making the sale of both properties necessary. While this reduces the amount that Elizabeth Rice must pay to the chapter 7 trustee to meet the liquidation test, it is not nearly enough to allow her to fund the chapter 13 plan as required by the liquidation test. Moreover, as the arrearage increases and the liquidation test decreases, the plan must still be funded sufficiently to reinstate the first trust.

Finally, Jeffrey Rice asserts that the proofs of claims are wrong—that the claims are too high. He litigated the IRS claim and that cannot now be contested. He argues, that he is entitled to credits against Donna Rice's claims. He has not objected to her proof of claim.[17] He focuses on credits that he asserts Donna Rice owes him and that reduce her claim. He claims that those credits total $105,000. Assuming that Donna Rice's only claim is her secured claim of $136,000 (that is, eliminating her unsecured claim in full, an assumption not justified by the record) and that Jeffrey Rice is entitled to a credit of $105,000, the most favorable assumption that can be made in favor of Mr. Rice, does that change the analysis? With these assumptions, the claims to be paid would be reduced to $289,332.[18] The net proceeds from the sale of the farm would be increased to $270,575.[19] This does leave a much smaller deficiency, one that Elizabeth Rice could fund, if she had any meaningful income. However, when one adds the likely mortgage arrearage, the amount simply becomes too much. Moreover, in light of the substantial continuing mortgage arrearage, it is not likely, even with Mr. Rice's assistance, that she has the wherewithal to fund any plan.

*Mr. Rice's Credits Against Donna Rice's Claim.* Much has been made of Mr. Rice's argument that he is entitled to credits against Donna Rice's claim. The parties, with just cause, are somewhat perplexed by the commissioner's report. Mr. Rice presented the commissioner's two reports and argued his position from them. The trustee candidly admitted that he cannot duplicate the commissioner's charts at the end of the second report. This is, in fact, a good thing. The commissioner's charts are not only difficult to follow and interpret, they are incomplete and in error.

The commissioner's report is attached to this Memorandum Opinion for ease of reference. There are three charts. The first, starting on page 1 of the charts and ending on page 2 is titled "Comp. Exh. 1, 1a 2 Update" in the upper left-hand corner and "Advances by Mrs. Rice" in the top center of the page. (The reference to Mrs. Rice is to Donna Rice.[20]) This will be called Chart 1 in this Memorandum Opinion. The second is on page 3 and is titled "Rentals—Main House" at the top center of the page. This page actually contains two charts. The top chart on the page is a spreadsheet of the rental income Mrs. Rice received from the farm from 1982 through 1998. It will be called Chart 2A. The bottom chart is a spreadsheet of Mrs. Rice's imputed rental payments from 1989 through 1998 for her exclusive occupancy of the main residence on the farm. This chart will be referred to as Chart 2B. The third chart is on page 4 and is titled "Advances Mrs. Rice," again at the top center of the page. It will be referred to as Chart 3.

---

**17.** The proof of claim was filed on November 17, 2003, after the case was converted to chapter 7.

**18.** Total from Table 2 less the balance of Donna Rice's claim. ($433,860.79 less $144,528.01).

**19.** This is the remaining equity for the farm from Table 1 increased by $105,000, the credit Mr. Rice claims.

**20.** For the purposes of the commissioner's accounting, Donna Rice will be referred to as Mrs. Rice and Jeffrey Rice will be referred to as Mr. Rice which are the same appellations used by the commissioner. Elizabeth Rice is not involved in this matter.

There are errors apparent on the face of the charts. Chart 2A is incomplete. The entries for 1997 are not completed across the table nor is the total for Column 5 completed. The total for Column 5 is unclear. If all the numbers are added up as indicated, the total is $50,548.47.[21] It is not possible to obtain the result in the total for Column 6 with this total for Column 5. If this total for Column 5 ($50,-548.47) is used to work across the page to the total in Column 6, the total in Column 6 should be $4,985.49. It is shown as $3,628.61.

The charts are cryptic. At first blush, it is not clear how they relate to each other. It appears to the court that the itemization of "Improvements" at the bottom of Chart 1 is carried over to Column 6 in Chart 3, broken down by year. That is, the total of the improvements on Chart 1 for 1997 is $7,055.48 which is about the same number for Improvements for 1997 on Chart 3.[22] The same is true for the 1998 improvements itemized at the bottom of Chart 1. The total is $9,046.04 which is brought forward to Chart 3 for Improvements for 1997 (Column 6, Line 35). Similarly, the note payments to Warrenton Farm Credit, the real estate taxes and the insurance expenses are all itemized on Chart 1 and are also brought forward to Chart 3, but all of the line entries on Chart 3 for Warrenton Farm Credit, real estate taxes, insurance expenses and improvements are not reflected on Chart 1. If the items are totaled by category on Chart 1, the total for the category does not match the total for the category on Chart 3.

The court notes that the commissioner states in paragraph 13(a) of his report that Chart 1 was "supplemented by payments brought to my attention since the hearing on February 2, 1998." Report ¶ 13(a) at 5. He then apparently distinguishes Chart 1 which he describes as "my compilation of Defendant's 1, 1a and 2 filed February 2, 1998" as later supplemented from Chart 3, which is "my compilation of advances by Mrs. Rice for the items shown." Report ¶ 13(b) at 5. The court concludes that Chart 1, except for the portion on the second page of the chart titled "Costs," is a portion of the commissioner's input data for Chart 3 and to the extent that input data is reflected on Chart 1 is incorporated into Chart 3. Chart 1 may be disregarded as a preliminary worksheet for Chart 3, a chart intended to be an intermediate compilation of the annual note payments to Warrenton Farm Credit, taxes, insurance, expenses, improvements and costs. By intermediate, the court means that it contains all of the expenses in the categories set out on the page, subdivided by year. The subdivision by year was required to perform the interest calculation the commissioner refers to in paragraph 11 of his report.

Charts 2A and 2B are intended to be the heart of the commissioner's spreadsheets. They take the data from Chart 3 and incorporate it with other data related to the actual rents received and the rent imputed to Mrs. Rice. While this appears to be the commissioner's attempt to transfer his textual findings to a single chart so that the net credit can be determined,

---

21. It is not clear what the negative $319.53 for 1983 represents but it was subtracted from the total of the remaining numbers.

22. There is a 48¢ difference between the total shown on Chart 3, Column 6, Line 33 and the actual total from Chart 1. This discrepancy does not affect the present analysis. It is either an inconsistency in the treatment of rounding numbers or an error. This discrepancy and other errors and omissions raise questions about the reliability of the commissioner's charts.

Charts 2A and 2B do not accomplish this objective.

Chart 2A contains the following information:

| Column 1 | Rental period |
| --- | --- |
| Column 2 | Income received during period |
| Column 3 | Expenses paid by Mrs. Rice during period |
| Column 4 | Net receipts—Column 2 minus Column 3 |
| Column 5 | Amounts that Mrs. Rice previously accounted to Mr. Rice for and for which she should not have to account a second time |
| Column 6 | One-half of Column 4 minus Column 5 |
| Column 7 | Interest calculation |
| Column 8 | Total amount due to Mr. Rice |

Chart 2B contains the following information:

| Column 1 | Period of time |
| --- | --- |
| Column 2 | Imputed rent for residence on farm |
| Column 3 | Costs of improvements paid for by Mrs. Rice |
| Column 4 | Column 2 minus Column 3 |
| Column 5 | Left blank |
| Column 6 | One-half of column 4 |
| Column 7 | Interest calculation |
| Column 8 | Total amount due to Mr. Rice |

The court sought to correlate the text of the commissioner's report to Charts 2A, 2B and 3. The text does correspond to Charts 2A, 2B and 3, but the amounts noted in the text as credits for Mr. Rice are not included in the charts. Looking at the text of the report, the commissioner shows the following credits to Mr. and Mrs. Rice, all of which correspond to the amounts in Chart 3:

| Paragraph [23] | Item | Mrs. Rice | Mr. Rice |
| --- | --- | --- | --- |
| 4 | Trust Payments (WFC) | $ 36,384.94 | $ 15,508.00 |
| 6 | Taxes | $ 29,633.39 | $ 22,887.37 |
| 5 | Insurance | $ 2,265.00 | $ 2,123.00 |
| 7 | Expenses | $ 44,204.25 | $ 0.00 |
| 8 | Improvements | $ 33,217.69 | $ 0.00 |
| 10 | Costs [24] | $ 6,008.47 | $ 0.00 |
| 11 | Interest—Imputed Rent | $ 0.00 | $ 18,738.97 |
| 11 | Interest—Rents Received | $ 0.00 | $ 5,428.27 |
| | Total | $151,713.74 | $ 64,685.61 |

This leaves the amounts discussed in paragraphs 2, 3 and 9 of the commissioner's report. They correspond to the entries in Charts 2A and 2B. Starting with Chart 2B, paragraph 2 is the total amount of the imputed rent and is carried over to Chart 2B, Column 2. Paragraph 9 is carried over to Chart 2A, Column 2, the total amount of rental payments received by Mrs. Rice. Paragraph 3 is carried over to Chart 2A, Column 5, the amounts that Mrs. Rice has previously accounted for to Mr. Rice.

It can be seen that all the amounts as credits for Mrs. Rice are carried over to Charts 2A, 2B and 3. However, to confuse matters, amounts in the text are carried over to *both* Charts 2(A or B) and 3. For example, the improvements of $33,217.69 appear at the total of the Improvements column on Charts 2B and 3.

*Chart 2A.* The income as set out in Column 2 of Chart 2A is the actual rental income received by Mrs. Rice. The total, $173,288.00, derives from paragraph 9. The

---

**23.** This refers to the paragraph numbers in the commissioner's report.

**24.** This represents the amount that Mrs. Rice has paid. The allocation of the obligation between Mr. and Mrs. Rice has not been made by the Circuit Court. Report, ¶ 10 at 4.

"Expenses" are the total of four columns from Chart 3, "WFC", "Taxes", "Insurance" and "Expenses". (Columns 2, 3, 4 and 5).

| Item (From Chart 3) | Source | Amount |
|---|---|---|
| WFC—Trust payments (Col.2) | Report, ¶ 4 | $ 36,384.94 |
| Taxes (Col.3) | Report, ¶ 6 | $ 29,633.39 |
| Insurance (Col.4) | Report, ¶ 5 | $ 2,265.00 |
| Expenses (Col.5) | Report, ¶ 7 | $ 44,204.25 |
| Total | | $112,487.58 |

The total of these four items, $112,487.58, compares favorably, but not exactly, to the total for "Expenses" on Chart 2A which is $112,768.56.

The next column, Column 4 titled "Net Recpt" is the difference between the Income (Column 2) and the Expenses (Column 3). Column 5 are the amounts Mrs. Rice previously accounted to Mr. Rice. They derive from paragraph 3 of the report. Column 6 is one-half the difference between the net receipts and the amounts previously accounted for (1/2 of (Column 4 minus Column 5)). Column 7 is the commissioner's computation of interest as described in paragraph 11. The court did not attempt to duplicate this calculation.

*Chart 2B*. Following the same methodology, Column 2 is the imputed income to Mrs. Rice. This is derived from paragraph 2 of the commissioner's report. Column 3 is the cost of improvements paid for by Mrs. Rice. This is the total from Chart 3, Column 6 which in turn is derived from paragraph 8 of the commissioner's report. Column 4 is the difference between Columns 2 and 3 (Column 2 minus Column 3). Column 6 is simply one-half of Column 4. Column 7 is again the commissioner's computation of interest as described in paragraph 11. The court did not attempt to duplicate this calculation.

The court concludes that Charts 2A and 2B are intended to be the commissioner's summary of his textual notes. Chart 3 is a worksheet leading up to Charts 2A and 2B. Chart 1 is an incomplete worksheet leading up to portions of Chart 3. The text discussions are all accounted for in the charts except for the court costs of $6,008.47 which the Circuit Court has not yet allocated between the parties.

It is apparent that there are mathematical errors in the charts, for example the total of the trust payments, taxes, insurance and expenses from Chart 3 and the supposed total for the same items brought forward to Chart 2A. Although the difference is small, the intended computation clear.

The ultimate question that the commissioner was to answer was the net credit between Mr. and Mrs. Rice. There is, however, no bottom line in the report. There is no chart showing Mr. Rice's credits which must be netted against Mrs. Rice's credits. There are some numbers and lines at the bottom of the page containing Charts 2A and 2B, particularly the number "$64,737.00". This is close to the total of Mr. Rice's credits. It appears that this portion of the page was an effort to create the net credit—the ultimate answer—but was never completed.

There is also a significant issue with the manner in which the amounts previously accounted for by Mrs. Rice to Mr. Rice are used in Chart 2A. The text states that:

The Commissioner has previously ruled, and the Court has confirmed, that Mrs. Rice has already accounted in an earlier support proceeding for rents collected of $4,239.00 per year, beginning for calendar year 1986 to present. She should not account a second time in this proceeding.

Report, ¶ 3 at 2. This paragraph is footnoted. The footnote states, "This amount is deducted in column 'Less' on chart entitled Rentals–Main House." This is Column 5, Chart 2A. The commissioner's statement is clearly correct. If Mrs. Rice accounted for these payments previously, she should not have to account for them a second time. The prior occasion was apparently a support proceeding. It would be appropriate to consider all of the income available to each of the parties and the disposition of that income to determine the proper level of support and the proper amount of unpaid back support.[25] Since neither the income nor the expenses were previously adjusted, the prior accounting must show up as a credit in this accounting. However, it appears that the commissioner may have made a patent mathematical error, a common mathematical errors associated with this type of accounting.[26] He gave Mr. Rice full credit for the prior payments or credits against the net of the gross income and the gross expenses BEFORE determining Mr. Rice's share of that net number. The credit should be given against the net number, AFTER determining Mr. Rice's share of the net number. In essence, Mr. Rice received a double credit.

An example is helpful. Assume that the gross income was $100,000 and the gross expenses were $40,000. It is readily apparent that the parties should split $60,000, that is, each should receive $30,000 at the end of the year. If the accounting is made at the end of the year and there are no interim distributions, this is exactly the result achieved. However, if there is an interim distribution to Mr. Rice only, let's assume that it is $20,000 at the middle of the year, it is readily apparent that when the final accounting is completed that he should be paid another $10,000, for a total for the year of $30,000. That is not what the commissioner did. His computation was the following:

| | |
|---|---|
| Gross receipts | $100,000.00 |
| Gross expenses | $ 40,000.00 |
| Net income | $ 60,000.00 |
| Less credit for interim distribution | $ 20,000.00 |
| Net income after credit | $ 40,000.00 |
| One-half | $ 20,000.00 |

This is obviously erroneous. Under this allocation, Mr. Rice receives his interim distribution of $20,000 and an additional distribution at the end of the year of $20,000 for a total of $40,000. How much does Mrs. Rice get for the entire year? $20,000. This represents no interim distribution to her and a $20,000 final distribution to her.

25. It is clear that Mr. Rice has not satisfied his support obligations.

26. This assumes that Mrs. Rice disbursed cash to Mr. Rice or that he received a cash-equivalent credit against other obligations that he owed her, such as spousal or child support. It is not erroneous if it is only a credit that was previously determined as to the farm accounting but for which no cash was disbursed or cash-equivalent credit was given. While the report is unclear on this point, it appears to have been a cash-equivalent credit or a credit not arising from the farm. The total net credit to Mr. Rice would be increased by about $25,500 more if the prior accounting were not a cash disbursement or a cash-equivalent credit or a credit not arising from the farm. This difference does not affect the result reached by the court today.

The court concludes that the commissioner's text is correct but that the charts are erroneous. There are mathematical errors. There are omitted numbers. The net credit from or to Mrs. Rice (and, therefore, the reciprocal credit to or from Mr. Rice) has not been determined. There is a patent error in the manner in which the credit to Mr. Rice for amounts previously accounted for by Mrs. Rice has been computed.[27] Moreover, the report only takes the accounting to the end of 1998. There are an additional five years to be completed.

There are two questions. The immediate question is the net credit to or from Mr. Rice. What is it? Does it make any difference in the court's previous calculations as to the disposition of the farm and the residence? The second question, not of immediate concern, is the procedure for completing the accounting.

The computation of the net credit between Mr. and Mrs. Rice will be taken from the text of the commissioner's report. The credits due from Mrs. Rice to Mr. Rice (unless otherwise indicated) as determined from the commissioner's report are as follows (all paragraph numbers refer to the commissioner's report):

**27.** It is possible that the text is wrong, but that does not appear to be the case.

**28.** Both Mr. and Mrs. Rice made payments on the Warrenton Farm Credit deed of trust. They are set out in Paragraph 4:

| | |
|---|---|
| Credit to Mr. Rice for payments made: | $15,508.00 |
| Credit to Mrs. Rice for payments made: | $36,384.94 |
| Net credit to Mrs. Rice: | $20,876.94 |

**29.** Both Mr. and Mrs. Rice made payments on the insurance policies. They are set out in Paragraph 5:

| | |
|---|---|
| Credit to Mr. Rice for payments made: | $2,123.00 |
| Credit to Mrs. Rice for payments made: | $2,265.00 |
| Net credit to Mrs. Rice: | $ 142.00 |

### Imputed Rent.

| | |
|---|---|
| Imputed rent (¶ 2) | $107,100.00 |
| Less Improvements (¶ 8) | $ 33,217.69 |
| Net imputed rent | $ 73,882.31 |
| One-half net imputed rent | $ 36,941.16 |

### Actual Rent Received.

| | |
|---|---|
| Rents received (¶ 9) | $173,288.00 |
| Less net trust payments (¶ 4) [28] | $ 20,876.94 |
| Less net insurance payments (¶ 5) [29] | $ 142.00 |
| Less net real estate taxes paid (¶ 6) [30] | $ 6,746.02 |
| Less repairs and expenses (¶ 7) | $ 44,204.25 |
| Net rent received | $101,318.79 |
| One-half net rent received | $ 50,659.40 |
| Less credit, prior accounting (¶ 3) [31] | $ 50,868.00 |
| Net credit to Mrs. Rice | ($ 208.60) |

### Net credit due to Mr. Rice.

| | |
|---|---|
| Net credit from imputed rent | $36,941.16 |
| Net credit from rental receipts | ($ 208.60) |
| Total net credit to Mr. Rice | $36,732.56 |

### Interest

The commissioner computed interest on each annual amount at the legal rate as in effect each year. (Report, ¶ 11). Because the purpose today is to determine whether the residence should be sold and not to determine the precise amount of the credit, the court assumed that the credit ac-

**30.** Both Mr. and Mrs. Rice made real estate tax payments. They are set out in Paragraph 6:

| | |
|---|---|
| Credit to Mr. Rice for payments made: | $22,887.37 |
| Credit to Mrs. Rice for payments made: | $29,633.39 |
| Net credit to Mrs. Rice: | $ 6,746.02 |

**31.** The credit is $4,239.00 per year commencing for calendar year 1986 to the present. The commissioner's report runs through 1997 as reflected on Chart 2A, Column 5. That is 12 years at $4,239.00 per year, for a total through 1997 of $50,868.00. The court notes that there are no amounts set out for 1998 and that in the text in paragraph 2 of the report, the imputed rent on the main house was carried through to December 1998.

crued equally over 12 years and applied an 8% interest rate on each annual balance due, computed as simple interest, that is, on the principal outstanding balance only. This provides, in the context of the analysis being done today, a sufficient estimate of the additional interest credit due to Mr. Rice. When the final accounting is done, the computation will be precisely made. The estimated interest credit is $19,100.

The total estimated credit due to Mr. Rice is $55,831. This estimate is significantly lower than the debtor's and confirms the trustee's judgment that he must sell both properties and that Elizabeth Rice is wholly unable to formulate or effectuate a feasible and confirmable chapter 13 plan. The trustee's judgment also takes into account the fact that Donna Rice has certain protections under § 363. One argument that she may make is that the residence should be sold first so as to minimize the harm to her on the sale of the farm, which is her residence. This is a legitimate matter for the trustee to consider. The detriment to her arising from the sale of the farm is a defense she raised. If successful, it would complicate the administration of this estate, certainly delay it—perhaps significantly—and possibly prevent a distribution to creditors.[32]

■ The second question is the procedure to be used to complete the accounting. The partition suit was filed by Jeffrey Rice in 1988. It has now been pending for almost 16 years without a resolution. While it is true that Jeffrey Rice has been in bankruptcy for many of those years, the suit could have been concluded years ago. The chapter 7 trustee in Jeffrey Rice's first bankruptcy abandoned the properties because he felt that there was no equity in them. That may well have been true then. However, there has been significant appreciation in real estate values since 1988 which substantially changes the analysis. Section 363 provides a means by which a trustee can sell real property owned by the debtor and a non-debtor without resorting to state court partition suits while protecting the rights of the third parties. The detriment to the third party must be considered and the third party is granted the right to purchase the property. To the extent that there is a dispute as to the disbursement of the proceeds of the sale, the sale may be made free and clear of the disputed liens and may be resolved by the court at a later date. This procedure is quicker than a state court partition suit. It is less expensive. In Virginia, the circuit court appoints a special commissioner of sale to effect the sale of the property. He will be paid. The proceeds will be turned over to the bankruptcy trustee who will be paid as well. The duplication of effort between the special commissioner of sale and the bankruptcy trustee and the resulting duplication of fees can be avoided if the sale is completed under the auspices of this court.[33]

The court can also complete the accounting. At present, the commissioner's re-

---

**32.** Donna Rice has her own problems. Even if she were to prevent the trustee from selling the farm, the IRS may seek to sell it after the bankruptcy case is closed if the trustee does not administer it. If neither the trustee nor the IRS force the sale of the farm, there is still a partition suit pending in Circuit Court. This makes the ongoing discussions between Donna Rice and the trustee meaningful.

**33.** It does not appear that all affected creditors have been joined in the partition suit. There may well be intracreditor disputes that raise marshaling questions. This court is in a far better position to resolve those matters. This court has jurisdiction over both properties, all the owners and all creditors of the owners.

port has not been finally approved by the circuit court and must be recommitted to the commissioner to update it from the end of 1998 to today, a period of a little over five years. Jeffrey Rice has no standing in the partition suit since the trustee has succeeded to his interests in it. In the interests of judicial economy, this court will retain exclusive jurisdiction over the debtor's interest in the real properties in question and will complete the accounting between Jeffrey Rice and Donna Rice.

■ One additional matter should be noted. Jeffrey Rice's arguments about the sequence of the sales of the properties is a marshaling argument. The principle underlying marshaling, however, is not for the benefit of the debtor, but for the benefit of the creditors. The essential question is: What is the best means to liquidate the debtor's properties so that the creditors receive the maximum return? The debtor's interests are secondary and the sequence will not be altered for the benefit of the debtor to the detriment of the creditors. In this case, all of the debtor's properties must be liquidated so the issue that the debtors raise, the sequence least detrimental to them is irrelevant.[34]

### Conclusion

The trustee properly seeks to exercise his discretion in the sequence in which he seeks to sell the properties. He may sell the properties in any order he deems appropriate. However, to preserve the right of the creditors as to any marshaling argument, he will sell the properties free and clear of all liens, except any unpaid real estate tax liens and the lien of the first deed of trust on the residence which are to be paid at closing. When both properties have been sold and the proceeds received,

he may propose the most equitable distribution of the remaining proceeds among the creditors. While all liens must be respected, it may make a difference as to which liens are paid first. Creditors may object to any proposed scheme of distribution at that time and will be heard on any issues that may be raised.

---

**34.** Debtors are entitled to consideration of the sequence of the liquidation of their assets for the benefit of creditors if there will be a 100%

distribution with assets left over to be returned to the debtor.